

1   **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8

9   Dennis Montoya, individually and on    )   No. CV-13-8068-PCT-SMM
    on behalf of those similarly situated,  )
10                                           )
            Plaintiff,                       )
11                                           )
    vs.                                      )
12                                           )
    3PD, Inc., The Home Depot, Inc., et al., )
13                                           )
            Defendants.                      )
14  ─────────────────────────────────       )   **MEMORANDUM OF DECISION**
                                             )            **AND ORDER**
15  3PD, Inc.,                               )
                                             )
16          Third-Party Plaintiff,           )
                                             )
17  vs.                                      )
                                             )
18  Big Dog Trucking and Material Handling,  )
    LLC,                                     )
19                                           )
            Third-Party Defendant.           )
20  ─────────────────────────────────       )

21          Pending before the Court is Defendant 3PD, Inc.'s ("3PD") motion for partial

22  summary judgment on three claims–that Plaintiff Dennis Montoya ("Montoya") is not

23  entitled to overtime compensation under the Fair Labor Standards Act ("FLSA"), that 3PD

24  properly paid Montoya his minimum wage, and that Montoya has not stated an unjust

25  enrichment claim. (Docs. 77-88.) 3PD's motion is fully briefed. (Docs. 129-133.) The

26  Court will follow its Initial Case Management Order and only rule on 3PD's objection to

27  Montoya's overtime compensation claim and to the unjust enrichment claim. (Doc. 57 at 2.)

28  Per the Initial Case Management Order, the Court will defer its ruling on Montoya's

1  minimum wage claim at this time.[1] (Id.) After due consideration, the Court will grant 3PD's
2  motion for partial summary judgment finding that Montoya is not entitled to overtime
3  compensation and that Montoya does not state a claim for unjust enrichment.

4                                    **BACKGROUND**

5       Plaintiff Montoya on behalf of himself and all others similarly situated filed a class
6  and collective action complaint alleging that Defendant Home Depot and Defendant 3PD
7  violated the FLSA's minimum wage and overtime compensation provisions and Arizona
8  wage laws by misclassifying non-exempt hourly delivery driver employees as independent
9  contractors. (Doc. 1.) Subsequently, Montoya filed a First Amended Class and Collective
10 Action Complaint. (Doc. 33.) After the Court scheduled a Fed. R. Civ. P. 16 Preliminary
11 Pretrial Conference (Doc. 40), the parties met, conferred, and filed a Rule 26(f) Case
12 Management Plan (Doc. 49). In their proposed joint case management plan, all of the parties
13 submitted different proposals regarding management of this case. (Doc. 49.)

14      At the Rule 16 conference, the Court determined that it would resolve certain legal
15 issues raised by Defendants before turning to the issues of class certification. (Docs. 57, 63.)
16 Subsequently, Home Depot filed a summary judgment motion on the issue of whether it was
17 a joint employer of Montoya (Docs. 89, 90) and 3PD filed a partial summary judgment
18 motion on whether the FSLA's Motor Carrier exemption preempted Montoya's claim for
19 overtime compensation and whether Montoya stated an unjust enrichment claim (Docs. 77-
20 88). The Court found that Home Depot was not Montoya's joint employer. (Doc. 110.) The
21 Court now finds that 3PD is exempted from paying Montoya overtime compensation due to
22 the FLSA's Motor Carrier exemption, 29 U.S.C. § 213(b)(1), and that Montoya fails to state
23 an unjust enrichment claim.

24      Plaintiff Montoya is a delivery driver, who entered into a Delivery Service Agreement

25 ───────────────

26      [1]The Court's Initial Case Management Order stated: **IT IS FURTHER ORDERED**
27 that Defendant 3PD shall file a motion for summary judgment regarding *applicability of the*
   *FLSA/motor carrier exemption and unjust enrichment* by Friday, January 10, 2014.
28 (emphasis added). (Doc. 57 at 2.)

1    ("DSA") on behalf of Big Dog Trucking and Material Handling, LLC, ("Big Dog") with

2    Defendant 3PD on December 7, 2009. (Doc. 34 at 21; Doc. 34-1 at 2-20.) Montoya was the

3    sole member and owner of the LLC.  (Id.)

4         3PD is a Georgia based logistics company providing interstate property broker and

5    freight forwarder services under authority granted by U.S. Dept. of Transportation Federal

6    Motor Carrier Safety Administration ("FMCSA").  (Doc. 79-1 at 2, Declaration of Kent

7    Ferris, Director of Remote Operations for 3PD.) 3PD does not perform the actual

8    transportation, delivery, or installation of its customers' goods.  (Id.)  Instead, 3PD contracts

9    with FMCSA-licensed motor carriers that provide the trucks and labor necessary to

10   accomplish these services.  (Id.)  Under Big Dog's contract with 3PD, Montoya was to make

11   deliveries for Home Depot's store in Kingman, Arizona.  (Id.)

12        The appliances sold by the Home Depot store in Kingman were manufactured at a

13   variety of locations across the United States and Mexico, including Iowa (Maytag), Indiana

14   (Whirlpool), Ohio (Whirlpool), Kentucky (Whirlpool), Arkansas (Whirlpool), Minnesota

15   (Frigidaire), and Mexico (LG, GE ).  (Doc. 87 at 2, Declaration of Bryan Ward, Director of

16   Logistics for Home Depot.)  Home Depot sells windows manufactured by Pella in Iowa and

17   Illinois, and flooring manufactured by Pergo in North Carolina. (Id.)

18        Depending on the type of goods sold and the geographic market area (either remote

19   or metropolitan) where the sales occur, the goods sold may: (1) move directly from the

20   manufacturers to retail stores owned by Home Depot, (2) move from the manufacturers to

21   Rapid Deployment Centers ("RDCs") that Home Depot owns and operates throughout the

22   United States, Canada, and Mexico for inventory control, (3) move from the manufacturers

23   to third-party logistics providers' facilities, or (4) from retail store to retail store.  (Id.)

24        The Home Depot in Kingman is classified as a remote store.  (Doc. 86 at 3,

25   Declaration of Jim Waters, former Senior Manager at Home Depot over direct to customer

26   delivery platforms, including store to customer appliance delivery and special order door and

27   window network.) Home Depot remote stores like Kingman carry a limited amount of

28   appliances, windows, and flooring in stock for sale to retail customers.  (Id.)  When a

customer purchases an appliance not in stock, Home Depot sends an electronic order to the manufacturer. (Id.) For a remote store like Kingman, purchased appliances are shipped from the manufacturers directly to the stores where the appliances were purchased for pick up by third-party logistics providers such as Montoya for delivery to the Home Depot retail customer. (Id.) When a customer purchases windows or flooring not in stock at a remote store, Home Depot sends an order to the manufacturer for the purchased windows or flooring and purchased windows and flooring are shipped from the manufacturers directly to the store where they were purchased for pick up by third-party logistics providers for delivery to the Home Depot customer. (Id. at 3-4.)

According to Mr. Ward, it is Home Depot's intent that the appliances, windows, and flooring that Home Depot purchases from the manufacturers move from the manufacturers' facilities to its stores and RDCs for delivery to Home Depot retail customers. (Doc. 87 at 3.)

**STANDARD OF REVIEW**

*FLSA–Motor Carrier Exemption*

The FLSA provides that for all hours worked over forty for the workweek that employers pay employees at the rate of one and one-half times their regular rate. 29 U.S.C. § 207(a)(1). The FLSA's overtime provision, however, is limited by certain statutory exemptions. In Klitzke v. Steiner Corp., 110 F.3d 1465, 1468 (9th Cir. 1997), the court stated that the motor carrier exemption under 29 U.S.C. § 213(b)(1), is construed narrowly and the employer seeking the exemption has the burden of proving entitlement. Id. at 1469. Whether any shipment of goods is considered to be in interstate commerce is determined on an *ad hoc* basis. Id.

Under the motor carrier exemption, the FLSA exempts from its overtime requirements any employee over "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). An employee's exemption pursuant to § 213(b)(1) "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). Under the applicable regulation, the employee

1    must be (1) employed by an employer subject to the jurisdiction of the Secretary of

2    Transportation, and (2) "engage in activities of a character directly affecting the safety of

3    operation of motor vehicles in the transportation on the public highways of passengers or

4    property in interstate or foreign commerce within the meaning of the Motor Carrier Act." Id.

5    The federal regulation identifies a driver as an occupation that directly affects the safety of

6    motor vehicles. Id., § 782.2(b)(1) and (b)(2). The regulation defines driver as "an individual

7    who drives a motor vehicle in transportation which is, within the meaning of the Motor

8    Carrier Act, in interstate or foreign commerce." Id., § 782.3(a)

9         *Partial Summary Judgment*

10        "A party may move for summary judgment, identifying each claim or defense–or the

11   part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a)

12   A court must grant summary judgment if the pleadings and supporting documents, viewed

13   in the light most favorable to the nonmoving party, show "that there is no genuine issue as

14   to any material fact and the movant is entitled to judgment as a matter of law." Id.; see

15   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union,

16   24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material.

17   See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at

18   1130. "Only disputes over facts that might affect the outcome of the suit under the governing

19   law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

20   The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury

21   could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

22        A principal purpose of summary judgment is "to isolate and dispose of factually

23   unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate

24   against a party who "fails to make a showing sufficient to establish the existence of an

25   element essential to that party's case, and on which that party will bear the burden of proof

26   at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir.

27   1994). The moving party need not disprove matters on which the opponent has the burden

28   of proof at trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may

not rest upon the mere allegations or denials of the party's pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)) ; Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. Anderson, 477 U.S. at 247–48.

## DISCUSSION

### Employee or Independent Contractor

In its motion for partial summary judgment, 3PD states its position that Montoya was its independent contractor, not an employee of 3PD, and thus is not covered by the FLSA. (Doc. 78 at 2.) 3PD then states, however, that even if Montoya is an employee of 3PD, "the undisputed facts establish that as a driver in interstate commerce Montoya was exempt from receiving overtime pay under the motor carrier exemption at 29 U.S.C. § 213(b)(1)." (Id.)

In its motion for partial summary judgment, 3PD has chosen not to argue and support its position that Montoya was an independent contractor, other than to state its position and offer a couple of citations. (Id. at 2, 4.) The Court will certainly not resolve an issue not properly litigated and supported by its proponent. Therefore, the Court will only consider whether under the FLSA's motor carrier exemption, Montoya, as an employee of 3PD, was subject to the motor carrier exemption at 29 U.S.C. § 213(b)(1) and not entitled to overtime compensation.

### Motor Carrier Exemption

"Any motor carrier that engages in interstate commerce is subject to the Secretary of Transportation's jurisdiction . . . and is thus exempt from the maximum hours provisions of the FLSA." Reich v. Amer. Driver Serv., Inc., 33 F.3d 1153, 1155 (9th Cir. 1994). Montoya concedes, except that he did not engage in interstate commerce, that he would be subject to the jurisdiction of the Secretary of Transportation's other requirements. (Doc. 129 at 6.) Therefore the issue before the Court is whether Montoya engaged in interstate commerce when he delivered goods from the Kingman Home Depot store to Arizona customers without

1   traveling across state lines.  If so, Montoya is subject to the Secretary of Transportation's

2   jurisdiction and exempt from the overtime provisions of the FLSA pursuant to 29 U.S.C. §

3   213(b)(1).

4       Citing Southern Pac. Transp. Co. v. ICC, 565 F.2d 615, 617 (9th Cir. 1977), 3PD

5   argues that even a driver who remains entirely in one state still engages in interstate

6   commerce if it is determined that the "shipper's fixed and persisting transportation intent at

7   the time of the shipment" involves a continuous movement of freight from one state to

8   another state. (Doc. 78 at 6-7.)  3PD contends that the Home Depot merchandise Montoya

9   delivered within Arizona was part of a continuous movement of freight across state lines.

10   (Id. at 7.)  It is undisputed that the goods sold by Home Depot and delivered by Montoya

11   were manufactured in several locations throughout the United States and Mexico.  (Id.; see

12   Doc. 87 at 2, Declaration of Bryan Ward, Director of Logistics for Home Depot.)

13   Continuing, 3PD argues that the fact that the goods Plaintiff delivered may have stopped

14   briefly at a Home Depot retail outlet or a RDC prior to delivery to its retail customers does

15   not result in a break in the interstate movement of the goods. (Id. at 7-8.)  3PD contends that

16   Montoya performed the last leg of the interstate deliveries to Home Depot's retail customers

17   within Arizona and therefore was engaged in interstate commerce. (Id. at 8.)

18       Citing 29 C.F.R. § 782.7(b)(2), Montoya contends that because Home Depot, as the

19   shipper, only moved the merchandise to a terminal storage point without a fixed and

20   persistent transportation intent beyond the terminal storage point, there was no engagement

21   in interstate commerce. (Doc. 129 at 3-4.)  According to Montoya, normally Home Depot

22   merchandise came from the manufacturer or supplier to the RDC, and then to the retail store,

23   and only then was it loaded onto his truck for delivery. (Id. at 8.)  Montoya argues that

24   because he was delivering goods from the Home Depot retail store, not a warehouse, he was

25   not engaged in interstate commerce. (Id. at 6.)  Montoya contends that local intrastate

26   deliveries from a retail outlet store do not involve the delivery driver in interstate commerce.

27   (Id. at 7.)  The Court disagrees.

28       Although not a reported case, the Court takes note of the similar factual analysis and

1   the persuasive legal reasoning contained in <u>Ruiz v. Affinity Logistics Corp.</u>, No. CV 05-

2   2125, 2006 WL 3712942 (S.D. Cal. Nov. 9, 2006).  Similar to this case, Mr. Ruiz was a

3   delivery driver who picked up Sears' merchandise from Sears' San Diego Market Delivery

4   Operation and delivered the merchandise to the retail customer.  The typical route from the

5   manufacturers was to Sears' Direct Distribution Centers, then to local Market Delivery

6   Operations, then out for delivery to the retail customer. <u>Id.</u> at *1.  At issue was whether Mr.

7   Ruiz was subject to the Motor Carrier exemption at 29 U.S.C. § 213(b)(1). <u>Id.</u>  It was

8   undisputed that Mr. Ruiz did not make any out-of-state deliveries to retail customers.  The

9   court confronted the same issue in its case as this Court does, that being whether Mr. Ruiz's

10  delivery of the final leg of Sears' merchandise from the San Diego Market Delivery

11  Operation to the retail customer was a delivery made in interstate commerce. The <u>Ruiz</u> court

12  turned to the seven factor evaluation put forward by the 1992 Interstate Commerce

13  Commission ("ICC") Policy Statement ("<u>Policy Statement</u>") for analysis of the legal question

14  regarding whether the delivery driver was engaged in interstate commerce. <u>Id.</u> at *4.  After

15  consideration of the Policy Statement factors and applying them to the facts at issue, the <u>Ruiz</u>

16  court concluded that Mr. Ruiz was subject to the Motor Carrier exemption. <u>Id.</u> at *4-7.

17          The Court agrees with the reasoning of the <u>Ruiz</u> court and does not find Montoya's

18  distinction between the San Diego Market Delivery Operation and the Kingman Home Depot

19  dispositive; rather the Court finds similarity.  Just as Mr. Ruiz picked up the final leg of the

20  interstate delivery at the San Diego Market Delivery Operation to the retail customer, so

21  Montoya picked up the final leg of the interstate delivery at the Kingman Home Depot to the

22  retail customer.  Just as Sears intended for its shipment from the manufacturer to continue

23  in interstate commerce till it reached the retail customer, so also Home Depot manifested the

24  same shipper's fixed intent–it intended for its shipment from the manufacturer to continue

25  in interstate commerce till it reached the retail customer.  See <u>Klitzke</u>, 110 F.3d at 1469

26  (stating that whether transportation is interstate or intrastate is determined by the essential

27  character of the commerce manifested by the "shipper's fixed and persisting transportation

28  intent at the time of the shipment").

As in <u>Ruiz</u>, the Court finds that the 1992 ICC Policy Statement provides the appropriate test for determining whether Montoya's deliveries engaged him in interstate commerce.  <u>Policy Statement, Motor Carrier Interstate Transportation from Out-of-state Through Warehouses to Points in Same State</u>, 8 I.C.C.2d 470, 1992 WL 122949 (I.C.C. April 27, 1992).  As made clear by the Supreme Court in <u>Levinson v. Spector Motor Serv.</u>, 330 U.S. 649, 676-77 (1947):

> [I]t is important to recognize that, by virtue of the unique provisions of § 13(b)(1) of the Fair Labor Standards Act, we are not dealing with an exception to that Act which is to be measured by regulations which Congress has authorized to be made by the Administrator of the Wage and Hour Division, United States Department of Labor. [] Instead, we are dealing here with the interpretation of the scope of the safety program of the Interstate Commerce Commission, under § 204 of the Motor Carrier Act, which in turn is to be interpreted in the light of the regulations made by the Interstate Commerce Commission pursuant to that Act."

<u>Id.</u>  The ICC Policy Statement sets forth seven factors to be evaluated in order to determine whether the shipper has a "fixed and persistent transportation intent at the time of the shipment" to have the shipment continue in interstate commerce to its ultimate destination. <u>See</u> <u>Klitzke</u>, 110 F.3d at 1469.

> Factor No. 1.
>
> Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the state. This may include, but is not limited to, historical sales in the State, actual present orders, and relevant market surveys of need.

<u>Policy Statement</u>, 1992 WL 122949 at *2.

Home Depot is the shipper of the merchandise that comes from different manufacturers located in different states and in Mexico.  (Doc. 86 at 2-3.)  It is undisputed that Montoya delivered to customers building materials, appliances, and flooring that were shipped from the manufacturer from various locations across the United States to the Home Depot store located in Kingman.  (Doc. 84 at 7-8; Doc. 132 at 10; Docs. 132-1 and 132-2.)  Based on the declaration of Mr. Waters, former Home Depot Senior Manager over direct to customer platforms, Home Depot remote stores like Kingman carry a limited amount of

1    appliances, windows, and flooring in stock for sale to retail customers.  (Doc. 86 at 3.)  When

2    a customer purchases an appliance not in stock, Home Depot sends an electronic order to the

3    manufacturer.  (Id.)  For a remote store like Kingman, purchased appliances are shipped from

4    the manufacturers directly to the stores where the appliances were purchased for pick up by

5    third-party logistics providers such as Montoya for delivery to the Home Depot customers.

6    (Id.)  When a customer purchases windows or flooring not in stock at a remote store, Home

7    Depot sends an order to the manufacturer for the purchased windows or flooring and

8    purchased windows and flooring are shipped from the manufacturers directly to the store

9    where they were purchased for pick up by third-party logistics providers for delivery to the

10   Home Depot customer.  (Id. at 3-4.)

11        Home Depot stores may sell appliances, windows, and flooring to its customers once

12   the manufacturers give Home Depot a release date (i.e., a date that the newly-manufactured

13   goods are available for shipment by Home Depot to its stores).  Many sales occur on

14   appliances, windows, and flooring that have a release date but are still on the manufacturers'

15   production line, while other sales occur on appliances, windows, and flooring that are in

16   transit to the stores from the manufacturer.  (Id. at 4.)

17        According to Mr. Waters, the Kingman Home Depot store received daily truckloads

18   of goods.  Each day reports were reviewed to determine whether there are goods on

19   recently-arrived trailers that are late or could become late for delivery because of a pending

20   order to be filled for those goods. Those pending orders may include appliances, windows,

21   or flooring that have already been sold and designated for delivery to the Home Depot

22   customer.  (Id. at 5; see also Declaration of Bryan Ward, Home Depot Director of Logistics,

23   Doc. 87 at 3.)

24        Mr. Waters further stated that with respect to appliances, windows, and flooring that

25   were not already designated for specific customers, Home Depot places its orders based on

26   forecasting of the sales to be made by the retail stores. These forecasts are based on historical

27   sales information, seasonal trends, and anticipated promotional events. (Doc. 86 at 5.)

28        This first factor weighs in favor of a finding that the merchandise delivered by

1   Montoya was delivered as part of a continuous movement in interstate commerce. For remote

2   stores like Kingman, when an purchased item (appliance, windows or flooring) was not in

3   stock, Home Depot ordered the item and had it shipped to the store, where delivery persons

4   such as Montoya delivered it to the retail customer.  3PD submitted documents in support

5   showing Montoya delivering over 400 appliances in the first quarter of 2011.  (Docs. 132-1

6   and 132-2.)[2]  It is Home Depot's fixed intent at the time shipments such as these are made

7   from the manufacturer that they continue in interstate commerce to the retail customer.

8           Furthermore, sales occur on appliances, windows, and flooring that have a release date

9   but are still on the manufacturers' production line, while other sales occur on appliances,

10  windows, and flooring that are in transit to the stores from the manufacturer.

11          In addition, Home Depot places its orders with manufacturers based on forecasting

12  of the sales to be made by a retail store such as Kingman. These forecasts are based on

13  historical sales information, seasonal trends, and anticipated promotional events.  Thus, such

14  forecasts by Home Depot have a factual basis, and are not a mere plan to solicit sales within

15  the State.

16          Factor No. 2.

17          No processing or substantial product modification of substance occurs at the
        warehouse or distribution center. However, repackaging or reconfiguring
18      (secondary packaging) may be performed.

19  Policy Statement, 1992 WL 122949 at *2.  Home Depot does not process or repackage the

20  appliances, windows, and the flooring. They are delivered to the customers in the same way

21  they were received from the manufacturers. (Doc. 86 at 4.)  Thus, this factor also weighs in

22  favor of a continuous movement in interstate commerce.

23          Factor No. 3.

24          While in the warehouse, the merchandise is subject to the shipper's control and
        direction to the subsequent transportation.
25

26  _____

27      [2]Certainly such a level of participation by Montoya in deliveries meets 3PD's burden
    to establish that a plaintiff participated in more than a *de minimis* level of interstate activity.
28  See Reich, 33 F.3d at 1156.

1   Policy Statement, 1992 WL 122949 at *2.  Mr. Ward stated that the appliances, windows,

2   and flooring are subject to Home Depot's direction with respect to transportation. Home

3   Depot arranges for the transportation of the goods from manufacturers to its stores or

4   third-party logistics providers' facilities for delivery to the retail customer. (Doc. 87 at 3.)

5   Thus, this factor also weighs in favor of a continuous movement in interstate commerce.

6        Factor No. 4.

7        Modern tracking systems allow tracking and documentation of most, if not all
         of the shipments coming in and going out of the warehouse or distribution
8        center.

9   Policy Statement, 1992 WL 122949 at *2. Home Depot can track appliances, windows, and

10  flooring from the time it orders the goods from the manufacturer through delivery to its retail

11  customers.  (Docs. 87 at 3; 86 at 5.)  According to both Mr. Ward and Mr. Waters, Home

12  Depot tracks its shipments through to delivery to the retail customer.  Thus, this factor also

13  weighs in favor of a continuous movement of the merchandise in interstate commerce.

14       Factor No. 5.

15       The shipper or consignee must bear the ultimate payment for transportation
         charges even if the warehouse or distribution center directly pays the
16       transportation charges to the carrier.

17  Policy Statement, 1992 WL 122949 at *2. Mr. Ward stated that Home Depot is responsible

18  for and pays the transportation costs incurred for some appliances, windows, and flooring to

19  be shipped from the manufacturers to the customers.  (Doc. 87 at 3.)  Thus, this factor also

20  weighs in favor of a continuous movement in interstate commerce.

21       Factor No. 6.

22       The warehouse utilized is owned by the shipper.

23  Policy Statement, 1992 WL 122949 at *2.  Home Depot owns the stores and RDC's through

24  which its merchandise moves.  (Doc. 87 at 2.)  Thus, this factor also weighs in favor of a

25  continuous movement in interstate commerce.

26       Factor No. 7.

27       The shipments move through the warehouse pursuant to a storage in transit
         tariff provision.
28

1   Policy Statement, 1992 WL 122949 at *2. Neither party discussed this factor, so it is neutral.

2          In summary, each of the first six factors demonstrates that Montoya's delivery of the

3   Home Depot goods at issue was the last leg in a continuous movement in interstate

4   commerce.  Neither party discussed the final factor, so it is neutral.  Therefore, Montoya's

5   transportation of merchandise from the Kingman Home Depot to Home Depot customers was

6   as a matter of law a transportation in interstate commerce.  Montoya's deliveries were the last

7   leg of the interstate shipment of the merchandise from the manufacturers to the retail

8   customer.  Consequently, Montoya is subject to the motor carrier exemption under 29

9   U.S.C. § 213(b)(1), and is not entitled to overtime pay under the FLSA.

10          *Unjust Enrichment*

11          A claim for unjust enrichment may exist where a person confers a benefit to his

12   detriment on another and allowing the other to retain that benefit would be unjust. USLife

13   Title Co. of Ariz. v. Gutkin, 152 Ariz. 349, 354, 732 P.2d 579, 584 (App. 1986). To prevail

14   on an unjust enrichment claim, a plaintiff "must show: (1) an enrichment; (2) an

15   impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the

16   absence of justification for the enrichment and the impoverishment; and (5) the absence of

17   a legal remedy."  Trustmark Ins. Co. v. Bank One, Ariz. NA, 202 Ariz. 535, 541, 48 P.3d

18   485, 491 (App. 2002).  Where a specific contract exists between the parties, the doctrine of

19   unjust enrichment is unavailable. Id. at 542, 48 P.3d at 492; see also Brooks v. Valley Nat.

20   Bank, 113 Ariz. 169, 174, 548 P.2d 1166, 1171 (1976).   This is because the essence of an

21   unjust enrichment claim is that there is no direct relationship between the parties under which

22   the plaintiff may recover. "In the absence of law to the contrary, Arizona generally follows

23   the Restatement." Hunnicutt Constr., Inc. v. Stewart Title and Trust of Tucson Trust No.

24   3496, 187 Ariz. 301, 306 n.6, 928 P.2d 725, 730 n.6 (App. 1996).  Thus, the Court will rely

25   on the Restatement in its examination of Montoya's unjust enrichment claim.

26          Here, the facts are undisputed.  3PD and Big Dog, solely owned by Montoya, have

27   a contractual relationship with one another.  Big Dog and 3PD entered into and executed a

28   DSA which governed their employment relationship.  (See, e.g., Doc. 79-1 at 6-24.)  The

1  DSA specifies how Big Dog will be compensated for delivery services for Home Depot.

2  Montoya concedes that the DSA exercises an enormous amount of control over himself and

3  his performance under the contract.   (Doc. 129 at 5 n.1.)  The contractual relationship

4  between the parties remains in full force and effect unless and until it is found inapplicable

5  for some reason such as being a contract of adhesion, as void against public policy, or some

6  other unenforceable reason.  Under Arizona law, Montoya's unjust enrichment claim is not

7  available so long as a specific contract between the parties governs compensation for work

8  performed.  <u>See</u> <u>Trustmark Ins. Co.</u>, 202 Ariz. at 542, 48 P.3d at 492.

9          However, even when the Court assumes that the DSA is unenforceable and that

10  Montoya is an employee rather than an independent contractor, the <u>Restatement</u> <u>(Third) of</u>

11  <u>Restitution and Unjust Enrichment</u> § 32 holds that "[t]here is no unjust enrichment if the

12  claimant receives the counterperformance specified by the parties' unenforceable

13  agreement." <u>Id.</u>, § 32(2).  There is no allegation that 3PD has failed to perform under its

14  understanding of its payment responsibilities to Big Dog, and thus to Montoya.  Thus, even

15  if the Court found that the DSA was void, under the Restatement, as a matter of law Montoya

16  cannot succeed on his unjust enrichment claim.

17          The Court finds persuasive <u>Scovil v. FedEx Pkg. System, Inc.</u>, No. CV 1:10-515, 2011

18  WL 2968350, *2 (D. Me. July 21, 2011), where FedEx delivery drivers alleged that they had

19  been misclassified as independent contractors rather than employees.  Construing and

20  applying <u>Restatement</u> <u>(Third) of Restitution and Unjust Enrichment</u> § 32(2), the court held

21  that even if the drivers' independent contract agreements were void due to public policy, the

22  drivers could not succeed on an unjust enrichment claim because FedEx had already

23  performed under the agreement.  <u>Id.</u>

24          In this case, the Court makes the same determination.  The facts are undisputed and

25  as a matter of law, Montoya cannot succeed on his unjust enrichment claim.

26                                      **CONCLUSION**

27          Accordingly, on the basis of the foregoing,

28          **IT IS HEREBY ORDERED** granting in part and denying without prejudice in part

1     Defendant 3PD's motion for partial summary judgment.  (Doc. 77.)

2         **IT IS FURTHER ORDERED** granting 3PD's motion for partial summary judgment

3 regarding Montoya's claim that he is entitled to overtime compensation under the FLSA. The

4 Court finds that pursuant to the FLSA's Motor Carrier exemption, 29 U.S.C. § 213(b)(1),

5 Montoya is not entitled to overtime compensation.  Montoya's claim for overtime

6 compensation under the FLSA is dismissed.

7         **IT IS FURTHER ORDERED** granting 3PD's motion for partial summary judgment

8 regarding Montoya's claim for unjust enrichment.  Montoya's claim for unjust enrichment

9 is dismissed.

10         **IT IS FURTHER ORDERED** denying without prejudice 3PD's motion for partial

11 summary judgment regarding Montoya's claim that 3PD violated the FLSA's minimum wage

12 provisions.  3PD may renew its motion for partial summary judgment regarding Montoya's

13 claim that 3PD violated the FLSA's minimum wage provisions following a supplemental

14 Rule 16 scheduling conference on Montoya's remaining claims.

15      DATED this 30th day of March, 2015.

16

17

18                       Stephen M. McNamee

                      Senior United States District Judge

19

20

21

22

23

24

25

26

27

28